IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In the Matter of the Extradition of | ) | |
| | ) | Case No. 4:21-MC-014 |
| DŽEVAD PAJAZETOVIĆ | ) | |
| | ) | <u>Filed Under Seal</u> |
| | ) | |

## MEMORANDUM OF EXTRADITION LAW AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to Bosnia and Herzegovina ("Bosnia"), respectfully requests that the fugitive in this case, Dževad Pajazetović ("Pajazetović") be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Pajazetović should be detained. In short, Pajazetović should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight, is not a danger to the community, and special circumstances warrant his release.

## BACKGROUND

Bosnia seeks the extradition of Pajazetović to serve a sentence imposed on one count of murder in violation of Article 171, paragraph 2, line 6 of the Criminal Code of the Federation of Bosnia and Herzegovina. On October 20, 1999, the Cantonal Court in Bihać convicted Pajazetović of murder and sentenced him to 15 years'

1

imprisonment. Pursuant to an appeal filed by Pajazetović, the Supreme Court of BiH upheld his conviction but reduced his sentence to 11 years' imprisonment on December 12, 2000. On December 19, 2000, a judge for the Cantonal Court in Bihać ordered the execution of Pajazetović's 11-year prison sentence. Bosnia's request for extradition is based on the following facts:

On October 24, 1994, Pajazetović, who was a member of a military unit responsible for guarding Bosnia's border with Croatia, illegally attempted to bring 200 liters of fuel from Croatia into Bosnia. Derviš Okić ("Okić"), a Bosnia and Herzegovina military police officer guarding the border, stopped Pajazetović and demanded that he hand over 20 liters for the brigade. Pajazetović refused, and Okić then fired three warning shots into the ground in front of Pajazetović. In response, Pajazetović fatally shot Okić.

Witness Senad Kličić, said that Okić was performing his duties as a military police officer, who duties included ordering the police to prevent people from smuggling items across the border.

Witness Jasmin Čaušević ("Čaušević") saw Pajazetović carrying fuel and a rifle, Okić asking whose fuel it was, and Okić telling Pajazetović that the fuel would be confiscated and taken to the command post. Čaušević was walking away when Pajazetović refused Okić's demand to surrender the fuel, and the two men started arguing. Čaušević turned back and saw both Okić and Pajazetović cock their rifles, and he then heard shooting. Čaušević said that both men fired their weapons, but he

could not tell in which direction they shot. Čaušević then called his brother over, and they went to the scene, where Pajazetović pointed his rifle at them and said it was not his fault. Čaušević's brother took the rifle away from Pajazetović, who was taken to the hospital.

Witness Samir Šakanović said that he knew Okić had tried to confiscate the fuel from Pajazetović, and that the two had a bad relationship. He did not see the incident but heard shots from the command post. When he got to the scene Okić was dead and Pajazetović pointed a rifle at him and said he was wounded.

Witnesses Mehmed Pajazetovič and Nijaz Čaušević said they heard shots being fired from inside a car parked nearby. When they got to the scene Okić was dead and Pajazetović pointed his rifle at them and said he was wounded.

Finally, witness Fikret Miljković said that he was in a house nearby when he heard shots being fired from the direction of the border. Pajazetović was later brought to his car with a leg wound. This witness also claimed that he saw Okić's body, which was taken to the hospital morgue.

According to medical records, Okić's body was examined and found to have gunshot wounds near the third and fourth rib on the right and an exit wound near the left shoulder blade. There was a second entry gunshot wound on the outside of the right knee, and another exit wound under the left knee.

Pajazetović was arrested, released from custody, and fled Bosnia prior to trial. The Cantonal Court in Bihać conducted a criminal trial against Pajazetović. The proceedings were conducted in absentia, but Pajazetović was represented by counsel. According to Pajazetović's defense presented at trial, Okić saw Pajazetović pouring fuel into a container and asked for 10% without specifying whether he wanted it for himself or for the brigade. After arguing about the fuel, Pajazetović told Okić he could take all the fuel and started walking away, when he heard a rifle click and Okić swearing at him. Pajazetović heard about ten gunshots and noticed that he was injured in his left hip. When he told Okić that he was hit, the officer threatened to kill him and pointed the rifle at him. Pajazetović then closed his eyes and pulled the trigger of his own rifle. He said that he did not know what happened to Okić.

After hearing the testimony of several witnesses and considering Pajazetović's defense, Cantonal Court in Bihać convicted Pajazetović and sentenced him to fifteen years' imprisonment. Pajazetović, again proceeding with counsel, filed an appeal to the Supreme Court. The Supreme Court upheld the conviction but reduced the sentence to eleven years' imprisonment upon concluding that the trial court had failed to give enough weight to Okić's role in the dispute. A judge for the Cantonal Court in Bihać ordered the execution of Pajazetović's 11-year prison sentence on December 19, 2000.

Bosnia has requested that Pajazetović be extradited pursuant to its bilateral extradition treaty with the United States, Treaty Between the United States and

4

Servia for the Mutual Extradition of Fugitives from Justice, U.S. Yugo., Oct. 25, 1901, 32 Stat. 1890 (hereinafter, "the Treaty"). The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Pajazetović's arrest. This Court issued the arrest warrant, and Pajazetović was arrested on March 1, 2021. Pajazetović is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I. LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A. The limited role of the Court in extradition proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see, e.g.*, *United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984) (noting that if evidence is sufficient to sustain the charge under the proper treaty the Court must certify the fugitive as extraditable to the Secretary of State). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Matter of Extradition of Sutton*, 905 F. Supp. 631, 636 (E.D. Mo. 1995) ("Historically, once the judge has certified his findings, the Secretary of State has conducted an independent review of the case to determine whether to issue a warrant of surrender to the requesting

nation.") "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) (summarizing extradition procedure); *see also Wiebe,* 733 F.2d at 553 (citing *Collins v.* Loisel, 259 U.S. 309, 315 (1922). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").

**B. The requirements for certification**

The Court should certify a fugitive's extradition to the Secretary of State when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive;

(3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008). The following sections briefly discuss each of those requirements.

1.     Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); S.D. Iowa LR 72(i)(19) (authorizing magistrate judges to hear extradition cases under 18 U.S.C. § 3184).

2.     Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Pajazetović, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint

made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3. Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also In re Atias to Israel*, 916 F. Supp. 2d 915, 918 (E.D. Mo. 2012) (noting that a valid treaty is a necessary requirement for extradition). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Bosnia and Herzegovina. The Court must defer to the Department of State's determination in that regard. *Then v. Melendez*, 92 F.3d 851, 854 (9th Cir. 1996).

### 4. Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. *See Ramanauskas v. United States*, 526 F.3d 1111, 1114 (8th Cir. 2008) (quoting *Wiebe*, 733 F.2d at 554) ("The purpose of extradition treaties is "the surrender of fugitives to be tried for their alleged offenses."). Article I of the Treaty provides for the return of fugitives charged with, or convicted of, an extraditable offense, as that term is defined under the Treaty. "The question of whether an offense is extraditable involves determining: (1) whether

it is listed as an extraditable crime in the relevant treaty; (2) whether the alleged conduct is criminalized in both countries; and, (3) whether the offenses in both countries are substantially analogous." *United States v. Knotek*, 925 F.3d 1118, 1129-30 (9th Cir. 2019).

Article II of the Treaty contains a list enumerating extraditable offenses, including murder and voluntary manslaughter. In assessing whether the crime for which extradition is requested is covered by the Treaty, the Court should examine the description of criminal conduct provided by Bosnia in support of its charge and decide whether that conduct constitutes an offense among those listed in Article II. *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933). An offense is "extraditable," regardless of whether it is expressly designated on the Treaty's list, so long as the underlying conduct constitutes one of the enumerated offenses. *See, e.g.*, *id.*; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes"). In determining whether the conduct constitutes an enumerated offense, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293-94.

Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902),

the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### 5. Probable cause that the fugitive has committed the offense

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crime charged by Bosnia was committed by the person before the Court. *Wiebe*, 733 F.2d at 552. "The probable cause standard applicable in extradition proceedings is defined in accordance with federal law and has been described as 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *Id.* at 553 (citing *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C. Cir.1973)). The extradition hearing is "not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested." *Id.* (citing *Collins*, 259 U.S. at 315; *Gusikoff v. United States*, 620 F.2d 459, 462 (5th Cir. 1980)); *see also Rios v. United States*, Civil No. 10-2192 (PJS/FLN); 2011 WL 915162, at *3-4 (D. Minn. Feb. 24, 2011). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)); *see also Castaneda v. United*

*States*, No. Civ.04–1332 ADM/JSM, 2005 WL 19457, at *3 (D. Minn. Jan. 3, 2005) (stating that the purpose of an extradition hearing "is to determine whether the Government has presented evidence supporting the finding that probable cause" and "not to resolve issues concerning the inconsistency of the evidence offered by the Government.).

In the case of a conviction, the Court's determination that there is probable cause may be based solely upon the existence of a judgment of conviction in the requesting country. *See Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) (stating that when "there has been a judgment of conviction [entered by a foreign court], there is no need for an 'independent' determination of probable cause: the relator's guilt is an adjudicated fact which *a fortiori* establishes probable cause") (citation omitted); *Sidali v. I.N.S.*, 107 F.3d 191, 196 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998); *United States v. Vigil*, No. 2:12–mj–0226 GGH, 2013 WL 314755, at *3 (E.D. Cal. Jan. 25, 2013).

A number of courts have held that even an *in absentia* conviction provides sufficient evidence of criminality to establish probable cause. *See, e.g.*, *Esposito v. I.N.S.*, 936 F.2d 911, 914 (7th Cir. 1991) ("Even if Esposito were correct that *in absentia* convictions ought not to be treated as evidence of guilt, they may certainly stand for something less: at the very least, in absentia convictions properly constitute probable cause to believe that the petitioner is guilty of the crimes in question."); *In re Extradition of Hughes*, No. EDCV 12-1831-JGB MLG, 2013 WL 1124294, at *6

(C.D. Cal. Mar. 18, 2013) (probable cause was established where fugitive was present for acquittal at trial but later convicted and sentenced *in absentia* on appeal); *United States v. Avdic*, No. 07-cr-M06, 2007 WL 1875778, at *8 (D.S.D. June 28, 2007); *United States v. Bogue*, No. 98-CRIM.A.-572-M, 1998 WL 966070, at *2 (E.D. Pa. Oct. 13, 1998); *see also Haxhiaj v. Hackman*, 528 F.3d 282, 291 (4th Cir. 2008) (holding that, "[e]ven assuming that the fact of an *in absentia* conviction by itself is an insufficient basis *per se* for a finding of probable cause," probable cause is established where an "appellate opinion [which affirms an *in absentia* conviction] go[es] well beyond the mere verdict, summarizing the underlying evidence amassed against Haxhiaj and his co-conspirators"); *but see Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) (court not precluded from considering sufficiency of evidence when conviction was obtained *in absentia*).

### C.  An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court.  *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  Accordingly, an extradition hearing is not a criminal proceeding, *see, e.g.*, *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993); and it is governed by "the general extradition law of the United States and the

provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Then*, 92 F.3d at 855. Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Collins*, 259 U.S. at 317; *Artukovic*, 784 F.2d at 1356. Nothing more is required, and typically nothing more is provided. *See, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *Eain*, 641 F.2d at 509 (sworn witness statements is competent evidence). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also, e.g.*, *Zanazanian*, 729 F.2d at 626-27.

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."). A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005).

13

Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998) (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Rios*, 2011 WL 915162, at *3 (internal citations omitted). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *See Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited. Rather, "[t]he [extradition] court's duty is to determine whether the evidence offered for extradition establishes probable cause, not whether such evidence is subject to a defense or is not credible when compared with that opposed to it. Such issues are left to the trial on the merits in the jurisdiction of the requesting party." *In re Atias to Israel*, 916 F. Supp. 2d 915, 930 (E.D. Mo. 2012); *see also Castaneda*, 2005 WL 19457, at *3.

## D.    Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184 & 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of

requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II. THE FUGITIVE SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statute that governs extradition in the United States, 18 U.S.C. § 3184, does not provide for bail. *E.g.*, *Sutton*, 898 F. Supp. at 693. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[1] *See Sutton*, 898 F. Supp. at 694. Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."

---

[1] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Pajazetović is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with an offense committed in violation of the law of the requesting state, Bosnia and Herzegovina.

*United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

## A. Applicable law

### 1. A strong presumption against bail governs in an international extradition proceeding

Unlike in domestic criminal cases, "[t]here is a presumption against bail in an extradition case." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *Sutton*, 898 F. Supp. at 694 (same); *see also Martin*, 993 F.2d at 827; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1294 (S.D. Fla. 2017) ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets

the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

    2.    <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *see also Sutton*, 898 F. Supp. at 694 ("Federal courts have held that release on bail should not be granted except under special circumstances.") (internal citations omitted); *United States v. Castaneda-Castillo*,

739 F. Supp. 2d 49, 55 (D. Mass. 2010) (fugitive must show that he is neither a risk of flight nor a danger to any person or the community). (S.D. Cal. 1996).[2] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7,

---

[2] Courts have placed different burdens of proof on fugitives when demonstrating the existence of "special circumstances." *Compare In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1214-15 (D. Nev. 1993), *with In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n.4 (C.D. Cal. 2006). Other courts have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g.*, *Matter of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016). The Eighth Circuit has not specifically addressed this burden of proof.

2016) (special circumstances must exist in addition to absence of risk of flight); *In the Matter of Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002) ("Whether defendant is, or is not, a risk of flight is not a matter that falls within the ambit of 'special circumstances' determinations."). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *Mainero*, 950 F. Supp. at 294 (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Matter of Extradition of Antonowitz*, 244 F. Supp. 3d 1066, 1071-72 (C.D. Cal. 2017); *Matter of Knotek*, No. LA CV 13-9204 BRO (JCG), 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Sutton*, 898 F. Supp. at 694-95; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

## B.    Analysis

The Court should detain Pajazetović without bond. Pajazetović is a significant flight risk and danger to the community.

As an initial matter, a fugitive charged with a crime in another country is already by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in his home country is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)).  This is particularly true here, where Pajazetović fled Bosnia after the criminal proceedings against him had already commenced there.  Further flight from the United States to yet another country or to an underground location in the United States is a reasonable assumption.  Moreover, the seriousness of the offense with which Pajazetović has been convicted, and the prison sentence to which he is subject in Bosnia, provides him with significant incentive to flee.  *See, e.g., Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail").  Accordingly, allowance of bail in any amount would not guarantee

Pajazetović's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Additionally, Pajazetović should remain detained because he constitutes a danger to the community. Pajazetović has been convicted of murder, and the serious nature of this crime places the community here in the United States, and abroad if he were to flee, in danger should he be released.

Pajazetović's risk of flight and danger to the community are sufficient, on their own, for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Pajazetović is not a flight risk and poses no danger to the community here or abroad, the government is unaware of any "special circumstances" that would justify bail in this case. Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Bosnia, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## III.    CONCLUSION

For the foregoing reasons, the United States requests that Pajazetović be detained pending resolution of this extradition proceeding.

Respectfully submitted,

Richard D. Westphal
Acting United States Attorney

By:    /s/ Virginia M. Bruner
Virginia M. Bruner
Assistant United States Attorney

U. S. Courthouse Annex, Suite 286
110 East Court Avenue
Des Moines, Iowa  50309
Tel:  (515) 473-9300
Fax:  (515) 473-9292
Email:  Virginia.Bruner@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2021, I
electronically filed the foregoing with the
Clerk of Court using the CM ECF system.  I hereby
certify that a copy of this document was served
on the parties or attorneys of record by:

_____U.S. Mail _____ Fax _____Hand Delivery

  X    ECF/Electronic filing    X    Other means (e-mail)

UNITED STATES ATTORNEY

By: /s/  Virginia M. Bruner
    Assistant U.S. Attorney