IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In the Matter of the Extradition of | ) | Number 4:21-mc-00014 |
| | ) | |
| DŽEVAD PAJAZETOVIĆ. | ) | BRIEF OF DŽEVAD PAJAZETOVIĆ |
| | ) | IN OPPOSITION TO EXTRADITION |
| | ) | |

COMES NOW Dževad Pajazetović, and in support of his position that the Court should

dismiss the complaint requesting extradition and his motion for release states as follows:

## I. TABLE OF CONTENTS

II. TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A. CONSTITUTIONAL PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B. STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    C. RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    D. CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    E. OTHER AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2. Factual History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    1. Legal basis for extradition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    2. Procedure for the extradition hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    3. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        a. Validity of the Treaty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        b. Identity of the realtor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        c. The offense charges is extraditable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        d. The requirement of "double criminality." . . . . . . . . . . . . . . . . . . . . . . . . . 15
        e. The required documents have been presented, translated, and duly authenticated
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        f. All other treaty procedures have been followed . . . . . . . . . . . . . . . . . . . . . . 17
        charged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## II. TABLE OF AUTHORITIES

A. CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Const. art. II, § 2, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. Const. art. III, § 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B. STATUTES

18 U.S. Code § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 3181(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 3184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

18 U.S.C. § 3196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Iowa Code § 707.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C. RULES

Fed. R. Crim. Pro. 54(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Evid. 1101(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D. CASES

*Basic v. Steck*, No. 5:12-cv-274-KKC, 2015 U.S. Dist. LEXIS 89994 (E.D. Ky. July 9, 2015)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Benson v. McMahon*, 127 U.S. 457 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bingham v. Bradley*, 241 U.S. 511 (1916) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brinegar v. United States*, 338 U.S. 160 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Carroll v. United States*, 267 U.S. 132 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Coleman v. Burnett*, 155 U.S. App. D.C. 302, 477 F.2d 1187 (D.C. Cir. 1973) . . . . . . . . . . 14, 19

*Collins v. Loisel*, 259 U.S. 309 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Greci v. Birknes*, 527 F.2d 956 (1st Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gusikoff v. United States*, 620 F.2d 459 (5th Cir. 1980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Extradition of Handanovic*, 829 F. Supp. 2d 979 (D. Or. 2011) . . . . . . . . . . . . . . . . . . . 15

*In re Extradition of Manzi*, 888 F.2d 204 (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Extradition of Rabelbauer*, 638 F. Supp. 1085 (S.D.N.Y. 1986). . . . . . . . . . . . . . . . . . . . 14

*In re Extradition of Sutton*, 905 F. Supp. 631 (E.D. Mo. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Melia v. United States*, 667 F.2d 300 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Pajkanovic v. United States*, 353 F. App'x 183 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . 15

*Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358 (S.D. Fla. July 30, 1999 . . . . . . . . . . 14

*United States v. Lui Kin-Hong*, 110 F.3d 103 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. McRae*, 593 F.2d 700 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Nolan*, 651 F. Supp. 2d 784 (N.D. Ill. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Wiebe,* 733 F.2d 549 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Wright v. Henkel*, 190 U.S. 40 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E. OTHER AUTHORITY

Criminal Code of Federation of Bosnia and Herzegovina , Chapter 16, Article 166 . . . . . . . . . 17

LR 72(i)(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## III. FACTUAL BACKGROUND

*1. Procedural History*. On February 24, 2021 the Government filed a complaint seeking

extradition of Dževad Pajazetović to Bosnia and Herzegovina (Bosnia). The complaint alleges that Mr. Pajazetović was convicted of murder on October 20, 1999 in the cantonal Court in Bihać and sentenced to 15 years imprisonment. The complaint further alleges that the Supreme Court of Bosnia upheld his conviction but reduced the sentence to 11 years imprisonment on December 12, 2000. Mr. Pajazetović is an American citizen who has resided in the Southern District of Iowa for many years.

The complaint alleges that there exists an extradition treaty between the United States and Bosnia. The treaty was originally executed between this country and Servia on October 25, 1901. The treaty is alleged to continue to be in effect as both Yugoslavia and then Bosnia are successor states which have both affirmed the treaty.

*2. Factual History*. On October 24, 1994, during the Bosnian war, Derviš Okić was killed in the area of the village of Laiša, Municipality of Velika Kaduša. This is in the far northwest part of Bosnia and Herzegovina, located near the border with Croatia.

This is a tale of two proceedings. The second, which is the only one referenced in the Government's complaint, is a civilian criminal case charging Mr. Pajazetović with murder. A summons was issued for Mr. Pajazetović to appear on September 20, 1999. Exhibit B, page 17. There was a one day trial in 1999 *in absentia.* Written witness statements submitted and he was convicted and eventually sentenced to eleven years in prison. According to the documents submitted along with the extradition request from the Bosnian government, the witness summaries include the following:

> Jasmin Ćaušević claims saw the accused armed with automatic rifle, carrying the fuel, and at that time the victim Derviš, who was a military police officer, asked the accused whose fuel was he carrying and said that the fuel is to be confiscated and taken to the command post. The accused refused and they started arguing, and this witness, as he emphasizes 'knowing that something was about to happen' started

4

walking uphill towards a car. While he was going uphill he turned around and saw Okić cocking his rifle, then the accused cocked his rifle as well, and then the shooting could be heard. According to this witness's statement both of them fired and he could not say in what direction they were shooting. After this the witness called his brother and together they went to the spot. They approached Pajazetović and he pointed his rifle at them. Pajazetović then told them that it was not his fault. The witness states that the accused said that he was afraid of them. Then the witness's brother took the rifle from the accused and they went to the spot where the victim was, and saw that his rifle was damaged. The witness also states that the accused was transported to the hospital.[1]

Senad Kličić said that the victim Derviš Okić was performing his duty of military police officer and that they had orders what to do in the case of border crossing and smuggling. He claims that he ordered the police to dissipate the citizens who were smuggling across the border, in area of their responsibility.

Mehmed Pajazetović and Nijaz Čaušević did not directly witness the incident, and claim that they were inside of a car that was parked near the spot when they heard the shots being fired. When they arrived to the spot they say that Okić was dead and the accused Pajazetović pointed his rifle at them, saying that he was wounded. The witness Fikret Miljkovic in his statement says that he was in a house about 50 meters from the spot, playing cards, when he heard the shots being fired from the direction of the border. After some time the accused Dzevad was brought to his car and he had a leg wound.

Samir Šakanović soldier of 506 Brigade, acting as battalion commander, and that his unit was guarding the border. He also claims that soldiers were allowed to buy minor quantities fuel across the border in order to be able to work on their lands. In relation to this incident he claims that he knew that the victim Derviš had tried to confiscate the canister of fuel from the accused, as well as they had bad relationship from before.

Exhibit 1 [Dkt. 14], pages 27- 28.

The family of Mr. Pajazetović have retained attorneys in Bosnia who have reviewed and obtained documents from the criminal file. See, Exhibit B. Important information was omitted from the Bosnian government's submission. This includes the actual witness statements, not just the

---

[1]In the original, the first and last names are inverted. For clarity, they have been reversed in this brief.

summary from the Court.

Nijaz Čaušević was one of the three people with Okić that day. His statement on the events

was:

> Then my brother Jasmin Čaušević and Okić went to the water because our task was
> to prevent smuggling. We heard bursts of fire a few minutes after they left. I and the
> other police officer got out of the car and ran down there, also towards the brook
> because the gunfire was coming from that direction. When we go there we first saw
> Dzevad Pajazetović; he was lying on the ground, bleeding. His rifle was pointed at
> me and he said 'No, nothing is my fault.' I went past him and reached Okić who was
> still showing signs of life; I saw wounds on him – on the left arm and on the chest.
> Okić drew his last breath a few moments later. I used a Motorola to call the leader
> of the platoon that was manning the front line there to bring a stretcher for
> Pajazetović who had been wounded and then contacted the battalion to prepare a
> vehicle. The platoon leader and several combatants carried the stretcher, took the rifle
> from Pajazetović and carried him towards the command of the unit that was on the
> front line there – Pajazetović was a combatant of that unit. I observed during these
> events that all the combatants on the front line there were intoxicated.

Exhibit B, page 9.

Jasminko Čaušević also gave a witness statement which was contained in the file:

> On 24 October 1994, on orders from the brigade commander, we went to assist the
> Military Police in the z/o /area of responsibility/ of the 1st Obt. The task was to
> prevent smuggling with Chetniks. Having report to the battalion command, I, Derviš
> Okić, Nijaz Čaušević and Mehmed Čaušević, we left in a JUGO car belonging to the
> Military Police to the PIK /forward line/; the company command was there as well.
> We left the car there. Late Derviš Okić and I and proceeded on foot to the location
> where buying was taking place while the other two guys remained in the car because
> it was raining. When we came to the spot where buying was taking place, we found
> two combatants and three or four civilians there. One of the combatants was Dzevad
> Pajazetović who had 50 liters of fuel while the others were waiting for their goods
> to arrive. Okić invited Pajazetović to come and carry the fuel to the car, with the
> command deciding what would be done next. Pajazetović started complaining and
> explaining that fuel had also been seized from him 10 days ago. Following a squabble
> and cursing, Okić cocked his rifle and Pajazetović did the same, chambering a bullet.
> Okić had an AP /automatic rifle/ while Pajazetović had a Kalashnikov. I was about
> 30 meters away and I saw Okić firing several rounds in front of himself, wounding
> Dzevad Pajazetović in the process. Then Pajazetović opened fire at Okić. I signaled
> my brother Nijaz and Mehmed Pajazetović; they were already moving towards me

having heard the shots. All three of us headed towards the location where Okić and Pajazetović were. We first approached Dzevad Pajazetović; he was lying down with his rifled pointed at us and said: do you see, brother, what he has done to me? I said: give your rifle over here, no harm will come to you. He complied. We then approached Derviš Okić; he was lying on his back and blood was coming out of his mouth. I saw that he was shot in an arm and the chest for there was a lot of blood. The rifle was damaged, but I do not know which part. Meanwhile, the company commander and several combatants showed up and carried Dzevad Pajazetović, sending him to a hospital. When they returned, we saw that Okić succumbed to his wounds. As Derviš Okić's brother (I do not know his name) was on that front area, I put him in a car and drove him to the command of the 1st Obt. I went back for Mehmed Pajazetović and Nijaz Čaušević and drove them to the battalion command. Crime department inspectors conducted a crime scene investigation two days later and we gave statements to them on what had happened.

*Id.*, page 9.

A second witness statement was also in the file from Jasmin Čaušević:

Since it was raining the four of us were in a car for one period and, after a while, I and Derviš Okić got out of the car and went together to the state border between the Republic of Bosnia and Herzegovina and the Republic of Croatia. When we arrived at the border, there were plenty of civilians transporting fuel and coffee and on the waterfront was Dzevad Pajazetović with a rifle in his hand. Fuel was brought to the waterfront then and at that moment MP Derviš Okić asked Pajazetović whose fuel it was. Pajazetović answered that it was his to which Okić said that the fuel had to be taken to the Command. Dzevad Pajazetović opposed it saying that Okić would not need it as he had previously confiscated several liters from him. They got into a row and I, sensing that something would happen, set off along an upward slope toward the car in which Nijaz Čaušević and Mehmed Pajazetović were. While I was walking uphill I turned around and saw that Derviš Okić cocked his rifle and that Dzevad Pajazetović then cocked his rifle, too. Since I was walking uphill I saw that Okić pointed his rifle in the direction of Dzevad Pajazetović, although from that position I could not see Dzevad Pajazetović well because there was a bush there. I saw that Derviš Okić shot in the direction of Dzevad Pajazetović, but I cannot say precisely whether he aimed directly at Dzevad Pajazetović or close to him as a warning. Dzevad Pajazetović then shot in the direction of Derviš Okić. As they were close by, I whistled to my brother who immediately came to the scene and went together with me to the two of them. When we arrived there Dzevad Pajazetović pointed the rifle at us, yet before that he had gone out from the bush and stood on the road, that is, he was lying on the right hip holding the rifle in his hand and he then told us that he was not to blame but that Derviš Okić had fired at him first. I then saw that Dzevad Pajazetović feared us, my brother took his rifle and then we went to the spot where

Derviš Okić was lying. Next to his body lay a rifle which, as far as I remember, was damaged, but I cannot say exactly which part of it was damaged.

*Id.*, page 55.

Mehmed Pajazetović also gave a witness statement:

On that day I was in patrol together with my colleague, MP Derviš Okić, and on the same day Nijaz Čaušević and Jasmin Čaušević of the IDV (Sabotage and Reconnaissance Platoon) were in a mixed patrol. We arrived to the border (the Korana River) by car which we parked 30 meters away from the state border between the Republic of Bosnia and Herzegovina and the Republic of Croatia. I and Nijaz Čaušević stayed in the car because it was raining at the time, while Derviš Okić and Jasmin Čaušević went to the river to inspect the state border and to prevent illicit trafficking that was taking place on that very spot. The name of that place is Laiša and there were plenty of civilians and soldiers then buying something at the black market. After just 10 minutes Jasmin Čaušević came to us and informed us that there had been shooting at the border, so Nijaz and I got out of the car and started moving toward the state border. While going there I heard two bursts, but when we arrived everything was over. We found Derviš Okić lying and he was dead already, while Dzevad Pajazetović pointed a rifle at the two of us and I remember that he then said that he was wounded and that he was not guilty and the like. Nijaz called the ambulance, Dzevad was transported to hospital and we immediately took Okić to the Company Command.

*Id.*, page 46.

Samir Šakanović was the company commander of the 506 Mountain Liberation Brigade, 1st Battalion, 3rd Company. He stated that the Battalion Commander was Captain Sead Kličić. Captain Kličić had given Šakanović the authority to allow soldiers to purchase fuel for personal use from across the Croatian border.

I remember that on that day the Accused and Senad Pajić came to me and asked for our permission to purchase 80 liters of fuel for themselves and two other soldiers. I personally approved it, whereupon the Accused contacted a person from the Republic of Croatia to carry it out. Meanwhile, a mixed patrol made up of two military policemen (Okić and Mehmed Pajazetović) and two members of IDV (Sabotage and Reconnaissance Platoon) (Jasmin Čaušević and Nijaz Čaušević), came to the 3rd Company's zone of responsibility without prior announcement to the security officer of the Battalion and the Brigade, reportedly for inspection of the state border. Upon

8

arriving at the border, MP Derviš Okić tried to confiscate the first jerry can with fuel that the Accused carried. I knew that they had a bad rapport from before for private reasons. I was not an eyewitness to the event and when they clashed, Senad Pajić called me on a Motorola radio to come, which I accepted and immediately set off toward the border. As soon as I ran out of the house where the Company Command was located, under heavy rain, I heard one burst and then another, and when I arrived on the scene Okić was lying dead, while the Accused pointed his rifle at me (saying I've been wounded in the leg). After that I filed a report for the Brigade in which I had written what I have just said. I know that Dzevad was hospitalized and that when it was over he returned to Velika Kladuša where he was when the Autonomous Province of Western Bosnia (APWB) was established, but I know that he was not a member of the APWB, because I heard it from my father and mother. He was there when the 5th Corps entered Velika Kladuša. A fee for the goods trafficked across the state border was taken only in case it was necessary to procure something for the Brigade. I had known the Accused from before, he was a soldier in my Company engaged as a courier. In the operation (Breza 94) he did not prove himself to be a proper fighter, yet he is a good person, he is not violent and he did not like to stand apart from others. As far as I know, Okić was a member of the 4th Brigade of the National Defense of the APWB in spring 1994 and he was prosecuted for the murder of one man from Skokovi, Senad Pajić knows his full name, and I know that Judge Vesna Šakanović sentenced him to nine years in prison. He was in prison together with the opponents of the APWB and he was there when Velika Kladuša was liberated. I personally know that he was a short-tempered man and a heavy drinker.

*Id.*, page 41.

Also found in the file was a handwritten report dated October 25, 1994. It was a report regarding the incident. It is unsigned, but consistent with the written report referenced by Šakanović.

The report states:

Having conducted interviews with the combatants who were present on site, I have learned that military police officer Dervis Okić came to the d/g /State border/ with intention of taking ušur /fee/ :from the civilian population that was buying goods at that location on the aforementioned day from the so-called SAO/Serbian Autonomous District/ Krajina; combatant Dzevad Pajazetović was at the same location. As the said combatant had already transferred goods across the State border, the aforementioned police officer demanded a 10% ušur, but the combatant opposed. Please bear in mind that the goods in question included 70 l of diesel fuel. Following a squabble, in front of everybody military police officer Okić opened fire in the direction of combatant Pajazetović; Pajazetović sustained an injury. Having realized that he was wounded, Pajazetović returned the fire, discharging several rounds in the

direction of Okić and killing him.

I would like to point out that the MP patrol did not announce its arrival that day to the */word illegible/* of the company even though the latter was in close vicinity of the incident. Furthermore, combatant Pajazetović was on duty until 13:00. After his shift ended, instead of going to the */word illegible/* of the company, he went to the State border.

*Id.*, page 11.

There was an earlier military proceeding in the immediate aftermath of the incident. There are references to this proceeding in the civilian file. A power of attorney is present in the second criminal file from Mr. Pajazetović's retained attorney from this first case. Exhibit B, page 19. There is also an attempt to serve the summons to the attorney, which was refused as he was retired at that point. *Id.*, page 17.

Mr. Pajazetović has retained papers from this first proceeding. The papers are consistent with the witness statements in the later case, with one important difference. Sead Kličić did give a statement in the military proceeding. There is no statement from him in the subsequent criminal case, and there is no indication that his witness statement was considered by the court at the trial in 1999. His statement is as follows:

As the commander of the 1st Battalion 506th Defense I was given a division of the military police platoon of our brigade by the brigade commander. On that occasion, I received a written order about hand over of this unit, which consisted of the 5 military police officers with Okić Derviš among one of them. Based on this written order of the command of the brigade, these military police unit could only act by my orders. Pursuant to this written order, each morning I gave a verbal order to the military police in terms of what to do. At the time the zone of responsibility of my battalion was about 17 km and I would issue these verbal orders to the military police officers each morning, what to do that day and how to act. I remember well that critical morning, actually, that critical day, I didn't make any specific assignments to the military police officer Okić Derviš, especially regarding entering the zone of responsibility of the 3rd company. When I instructed this unit, I would order the military police officers only to dispel the citizens who were smuggling goods at the state border in the zone of responsibility of my battalion, and they did not have any

10

approval to confiscate the goods from citizens. There was also a written order from the brigade commander that each of my fighters could take 20 liters of gasoline for their personal needs. I also verbally approved to my fighters when they were on the lines that they could buy the basic food supplies for their most basic needs. I repeat once again that Okić Derviš and his colleagues did not have my orders that day to go to the zone of responsibility of the 3rd company and he was not on duty that day, which means that he was not in the service and could only be there privately at his discretion. I would also like to mention that there were cases when civilian police officers from Cazin came to the zone of responsibility of my battalion, but I would drive them away because I was the only one responsible for securing the state border in the zone of responsibility of my battalion.

On this occasion I would point out that my responsibilities were not only in the state border but also in the depths of the territory, I think about 7 km.

When I would refer the military police to the task as a rule if there was any gasoline there, they would go by truck the so called, 110., and the citizens would already know when they would see that truck that it was the military police and they would run away. I used to refer them to the task with official vehicles as well. However, on the critical day, they, and by that I mean Okić Derviš and others did not leave by truck, nor with an official vehicle. During the control of the state border, the military police could only control the civilians and not the fighters of my battalion because, as I said, there was an order from the commander that the fighters could buy the appropriate amount of items for their needs.

Exhibit A, pages 31-32

After receiving this evidence, the Court ordered that Mr. Pajazetović be immediately released from custody. The Court explained, "it appears that the deceased Okić Derviš did not perform his duty on the critical day on by the order of the battalion commander, which means that he was not in the capacity of an official. Also, the evidence presented suggest that it could be a case of exceeding the necessary defense, when the Law provides for the possibility of milder punishment." *Id.*, page 34.

## IV. ARGUMENT

*1. Legal basis for extradition*. The Constitution gives the President the power to make treaties, with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. Congress is given

the power, under the necessary and proper clause, to enact laws needed to implement and enforce

treaties. U.S. Const. art. I, § 8, cl. 18. The judiciary has the power to hear cases involving treaties

made under the authority of the federal government. U.S. Const. art. III, § 2, cl. 1. Extradition to a

foreign country is governed by statute and the terms of the applicable treaty. Generally, it is only

allowed if there is an extradition treaty in force with the Untied States. 18 U.S.C. § 3181(a).

> If there is a valid treaty:
>
> Whenever there is a treaty or convention for extradition between the United States
> and any foreign government, or in cases arising under section 3181(b) any justice or
> judge of the United States, or any magistrate authorized so to do by a court of the
> United States, or any judge of a court of record of general jurisdiction of any State,
> may, upon complaint made under oath, charging any person found within his
> jurisdiction, with having committed within the jurisdiction of any such foreign
> government any of the crimes provided for by such treaty or convention, or provided
> for under section 3181(b), issue his warrant for the apprehension of the person so
> charged, that he may be brought before such justice, judge, or magistrate, to the end
> that the evidence of criminality may be heard and considered. Such complaint may
> be filed before and such warrant may be issued by a judge or magistrate of the United
> States District Court for the District of Columbia if the whereabouts within the
> United States of the person charged are not known or, if there is reason to believe the
> person will shortly enter the United States. If, on such hearing, he deems the evidence
> sufficient to sustain the charge under the provisions of the proper treaty or
> convention, or under section 3181(b), he shall certify the same, together with a copy
> of all the testimony taken before him, to the Secretary of State, that a warrant may
> issue upon the requisition of the proper authorities of such foreign government, for
> the surrender of such person, according to the stipulations of the treaty or convention;
> and he shall issue his warrant for the commitment of the person so charged to the
> proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184.

Until 1990, there was no statute authorizing the extradition of United States citizen to another

country in the absence of a treaty requirement. Congress then enacted a statute allowing the Secretary

of State to "order the surrender to that country of a United States citizen whose extradition has been

requested by that country if the other requirements of that treaty or convention are met." 18 U.S.C.

§ 3196.

There is a two step process for extradition between the judiciary and the executive branches. If the judicial officer determines that "the evidence is sufficient to sustain the charge under the provisions of the proper treaty," then they "shall certify" to the Secretary of State that a warrant for surrender "may issue." 18 U.S.C. § 3184. It is then within the Secretary's sole discretion to determine whether or not the person should actually be extradited. 18 U.S.C. § 3186. The Secretary has the authority to review the judicial officer's findings of fact and legal conclusions and my decline to extradite if it is found to be erroneous. *United States v. Lui Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997). The Secretary also has the power to decline to extradite on discretionary grounds, such as humanitarian and foreign policy considerations, and also has the sole power to attach conditions to an order of extradition. *Id*.

Magistrate Judges are allowed to conduct the hearing in this type of matter under the statute. Certifying extraditability is not an exercise of the judicial power exclusively given to judges under Article III of the Constitution. Both the statue and local rule allows for magistrate judges to hear this type of case. 18 U.S.C. § 3184; LR 72(i)(19). The extradition hearing is similar to the determination of whether there is probable cause to hold a defendant for trial or issuing a search warrant. *In re Extradition of Sutton*, 905 F. Supp. 631, 636-37 (E.D. Mo. 1995).

*2. Procedure for the extradition hearing.* The purpose of the hearing on extradition is to determine whether 'there is reasonable ground to believe that the person whose extradition is sought is guilty, that is, where there is sufficient evidence to justify extradition under the appropriate treaty." *United States v. Wiebe,* 733 F.2d 549, 552 (8th Cir. 1984), quoting *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981).

13

The extradition hearing is not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested. *Collins v. Loisel*, 259 U.S. 309, 315 (1922). *Gusikoff v. United States*, 620 F.2d 459, 462 (5th Cir. 1980). *See Benson v. McMahon*, 127 U.S. 457, 462-63 (1887). The probable cause standard applicable in extradition proceedings is defined in accordance with federal law and has been described as 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.' *Coleman v. Burnett*, 155 U.S. App. D.C. 302, 477 F.2d 1187, 1202 (D.C. Cir. 1973). *See Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980); *Greci v. Birknes*, 527 F.2d 956, 959 (1st Cir. 1976).

*Wiebe*, 733 F.2d at 553.

The Federal Rules of Criminal Procedure and the Federal Rules of Evidence expressly do not apply to extradition proceedings, Fed. R. Crim. Pro. 54(b)(5); Fed. R. Evid. 1101(d)(3). Hearsay and other excludable evidence, therefore, may be admissible. *Melia*, 667 F.2d at 302.

The Court's function in an extradition proceeding is not to determine the guilt or innocence of the person whose extradition is sought. Rather, the court must determine whether: (1) there is a valid extradition treaty; (2) the realtor is the individual sought; (3) the offenses charged are extraditable; (4) the requirement of "double criminality" is satisfied; (5) the required documents have been presented, translated, and duly authenticated by the United States Consul; (6); all other treaty procedures have been followed and (7) there is probable cause to believe the person committed the offenses charged. *In re Extradition of Rabelbauer*, 638 F. Supp. 1085, 1087 (S.D.N.Y. 1986).

The evidence offered in support of extradition must be "competent and adequate." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). If an extradition request consists of "mere conclusory allegations unsupported by substantive evidence, extradition will be denied." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. July 30, 1999).

The right to present evidence in opposition to extradition has been summarized as follows:

14

A realtor's right to introduce evidence in an extradition proceeding is limited. He 'is not entitled to contradict the demanding country's proof or pose questions of credibility, but is limited to offering evidence which explains or clarifies that proof.' Allowing the admission of explanatory evidence is intended to 'afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.' However, the court must ensure that the extradition proceedings are not converted into a 'dress rehearsal trial.' For this reason, evidence attacking the credibility of a witness is not permissible as issues of credibility are to be resolved at trial. Evidence that 'obliterates' probable cause may be considered.

*United States v. Nolan*, 651 F. Supp. 2d 784, 795 (N.D. Ill. 2009) (citations omitted).

*3. Argument*.

*a. Validity of the Treaty*. Here the Government has submitted a declaration from Tom Heinemann that the 1901 treaty is in full force and effect. Courts have previously held that the treaty between the two countries is valid and that Bosnia is a successor state entitled to the benefits of the agreement. *Sacirbey v. Guccione*, 589 F.3d 52, 56 n.8 (2d Cir. 2009); *Pajkanovic v. United States*, 353 F. App'x 183 (11th Cir. 2009); *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 983-85 (D. Or. 2011); *Basic v. Steck*, No. 5:12-cv-274-KKC, 2015 U.S. Dist. LEXIS 89994, at *17 (E.D. Ky. July 9, 2015).

*b. Identity of the realtor*. Mr. Pajazetović is not disputing that he is the individual sought by the Bosnia government.

*c. The offense charges is extraditable*. Murder is explicitly named as a crime for extradition under Article II, paragraph 1 of the treaty. However, as explained below, the general Bosnian definition of murder includes conduct which is not a crime in this country.

*d. The requirement of "double criminality."* The treaty requires that "extradition is also to take place for participation in any of the crimes and offenses mentioned in this Treaty, provided such participation may be punished in the United States as a felony and in Servia as crime or offense as

15

before specified." *Declaration of Tom Heinemann*, page 8. An extraditable offense must be a crime under the laws of both contracting countries. *Wright v. Henkel*, 190 U.S. 40, 58 (1903). "This requirement is 'central to extradition law.'" *In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989). The concept "does not require that the name by which the crime is described in the two countries be the same; nor that the scope of liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. The crime of murder is a violation of Federal law, as well as the laws of the various states. See, 18 U.S. Code § 1111; Iowa Code § 707.1.

"Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. Malice is defined as "an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard to the consequences of human life." *United States v. McRae*, 593 F.2d 700, 703-704 (5th Cir. 1979).

According to the Government Exhibit, murder was (and is) defined in Bosnia as:

(1) Whoever deprives another person of a life, shall be punished by imprisonment for not less than five years.

(2) The punishment of imprisonment for not less than ten years or long term imprisonment shall be punished whoever:

> 1) deprives another person of a life in a cruel or insidious way;
> 2) deprives another person of a life while acting ruthlessly and violently;
> 3) deprives another person of a life out of racial, national or religious reasons;
> 4) deprives another person of a life for greed, for the perpetration or covering up another criminal offence, out of unscrupulous vengeance or from other low motives;
> 5) deprives a life an official or military person in the exercise of duties of safeguarding the security, public peace and order or apprehending the perpetrator of a criminal offence or guarding a person deprived of freedom.

Government Exhibit [Dkt 14], page 7, *quoting* Criminal Code of Federation of Bosnia and Herzegovina , Chapter 16, Article 166. Here, simply "depriving" the life of another would not met this test, as that alone is not a crime in this country. One can "deprive" the life of another solely by causation, without regard to malice, intent or even negligence. The additional element of malice is the defining difference which makes murder a crime in this country. Only if the other special circumstances in paragraph two of the Bosnian statute are met would there be there be crime in each country.

Obviously, only certain parts of the special circumstances are applicable given the particular facts of this case. There is, for example, no evidence that the death occurred for racial or national reasons, or for greed or perpetration of another crime.

*e. The required documents have been presented, translated, and duly authenticated.* Mr. Pajazetović is not disputing that the required documents have not been transmitted as required. He does note, however, that his attorneys in Bosnia have filed papers to set aside the judgment as he was tried *in absentia*. See, Exhibit C. Should the Bosnia Court rule on this petition prior to the Court's determination of the issues, the undersigned will promptly inform the Court.

*f. All other treaty procedures have been followed.* It appears that the procedures outlined in the treaty have been followed. The Treaty does allow under Article VI that extradition shall not be allowed if for a crime of a political character or for political crime, or for a crime barred by limitations under Article VII. Mr. Pajazetović has no information which would indicate that either provision would apply to him.

*g. There is no probable cause to believe the person committed the offenses charged.* When all of the evidence is considered, probable cause is lacking in this case. Review of all of the witness

statements shows a clear and undisputed course of events. It does not show sufficient evidence that Mr. Pajazetović caused the death "a cruel or insidious way;" "while acting ruthlessly and violently;" or that he "deprive[d] a life an official or military person in the exercise of duties."

It is without dispute the Mr. Pajazetović had received permission and was authorized on the date in question to go and purchase the fuel. Samir Šakanović was the company commander and personally approved the purchase. It is also undisputed that Mr. Pajazetović did not initiate the events, including the fact that he did not fire his weapon until after he had been shot. Jasmin Èauševiæ observed the incident and was clear on this point. Sead Klièiæ was in command of the military police in the area, including Derviš. His statement confirmed that Derviš was not on duty at the time and had no authority over soldiers such as Mr. Pajazetović. He also had no authority to take property from any soldiers. It was with this additional information, not presented to the civilian court, that the military court essentially found no probable cause for the death with special circumstances and released him in April, 1996. The civilian case was apparently restarted three years later, in September, 1999. By the time of the trial, this critical statement was not presented to the court for consideration.

Mr. Pajazetović was carrying fuel. He was doing was he had received permission to do. He was accosted by an armed man who was not authorized to be on duty as a military police office. That man, while armed, tried to take his property without authority. When Mr. Pajazetović objected he was fired upon and wounded. It was only after he was shot that he fired his weapon.

"Probable exists where 'the facts and circumstances ... [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)(quoting *Carroll v. United States*, 267 U.S.

132, 162 (1925)). Here the evidence when considered as a whole does not show any of the necessary special circumstances that are necessary for dual criminality are present in this case. After full consideration, there cannot be "a reasonable belief of the accused's guilt." *Coleman,* 477 F.2d at 1187. In particular, the statement of Sead Klièiæthat the decedent was without any authority to stop Mr. Pajazetović or take his property, and that he was not acting as an officer is the type of evidence which "obliterates" probable cause. *Nolan*, 651 F. Supp. 2d at 795.

## V. CONCLUSION

For all of the reasons stated, the Complaint should be dismissed and Mr. Pajazetović released from custody immediately.

Respectfully submitted,

J. KEITH RIGG
317 Sixth Avenue, Suite 1300
Des Moines, Iowa 50309-4112
Telephone: (515) 284-7930
Email: jkrigg@dwx.com
ATTORNEY FOR DEFENDANT

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record at their respective addresses disclosed on the pleadings on April 27, 2021 through electronic service via CM/ECF.

Signature: